775 F.2d 231
 42 UCC Rep.Serv. 396
 HUTCHINSON UTILITIES COMMISSION OF the CITY OF HUTCHINSON,
Hutchinson, Minnesota, Appellee/Cross-Appellant,
v.
CURTISS-WRIGHT CORPORATION, a Delaware corporation,
Appellant/Cross-Appellee.
 Nos. 84-5165, 84-5184.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 17, 1985.
Decided Oct. 11, 1985.
 
 John M. Mason, Minneapolis, Mn., for appellant/cross-appellee.
 Lawrence Zelle, Minneapolis, Mn., for appellee/cross-appellant.
 Before BRIGHT, Senior Circuit Judge, ROSS and JOHN R. GIBSON, Circuit Judges.
 ROSS, Circuit Judge.
 
 
 1
 This is a diversity case governed by Minnesota law. The appellant, Curtiss-Wright Corporation (Curtiss-Wright), appeals from a judgment granting damages to Hutchinson Utilities Commission (Hutchinson) for Curtiss-Wright's breach of an express warranty and fraudulent misrepresentation in connection with the sale of a generating unit. Curtiss-Wright argues that the trial court erred in finding that Hutchinson had established a right to recover under the theories of either breach of warranty or misrepresentation. Curtiss-Wright also contends that the trial court should have reduced the damage award because Rolls-Royce, Ltd., a former defendant in the suit until it entered into a settlement with Hutchinson, was at least partially responsible for the damages incurred by Hutchinson. Finally, Curtiss-Wright alleges that the court erred in awarding Hutchinson prejudgment interest. Hutchinson cross-appeals, arguing that the trial court erred in refusing to grant it a rescission remedy and in denying its request for an attorneys' fees award. We reverse the trial court's prejudgment interest award, remand for a determination of whether Curtiss-Wright is entitled to have the damage award reduced based on Rolls-Royce's responsibility for some of the damages, and affirm in all other respects.
 
 FACTS
 
 2
 Hutchinson is a municipal electrical and natural gas utility company located in Hutchinson, Minnesota. In 1975, Hutchinson purchased a generating unit from Curtiss-Wright for $2,844,058.77. The unit, which is technically referred to as a Gas Turbine Generating Unit (GTGU), is composed of three major component parts: 1) a jet engine manufactured by Rolls-Royce, Ltd., 2) a power turbine manufactured by Curtiss-Wright, and 3) a power generator manufactured by Brush Electrical, Ltd.
 
 
 3
 On January 11, 1979, after Hutchinson had used the unit for approximately 700 operating hours, a piece of one of the twenty-six inlet guide vanes (IGVs) (a part of the Rolls-Royce engine anti-icing system which routes air from the engine to the compressor) cracked, was sucked into the engine, and caused internal damage to the engine. Curtiss-Wright transported the damaged engine to its headquarters in New Jersey for examination. The examination disclosed that many of the IGVs were cracked.
 
 
 4
 Curtiss-Wright took the position that the engine damage caused by the IGV cracking could have been avoided if Hutchinson had conducted proper periodic inspections of the IGVs. Accordingly, Curtiss-Wright refused to honor Hutchinson's request to repair the engine under a warranty which obligated Curtiss-Wright to "remedy, free of charge, any defects of workmanship or materials that give trouble of any kind." After negotiations, Curtiss-Wright ultimately repaired the engine and returned it to Hutchinson, but only upon Hutchinson's payment of $381,000 for the repairs. Curtiss-Wright alleges that the repairs actually cost $609,686.57.
 
 
 5
 While the engine was being repaired, Hutchinson hired a metallurgist to examine the stator casing--a large circular steel lining inside the power turbine. The metallurgist concluded that the stator casing was severely cracked and incapable of being welded.
 
 
 6
 Subsequently, in December of 1980, Hutchinson filed this action against Curtiss-Wright and Rolls-Royce. Curtiss-Wright filed a counterclaim against Hutchinson, seeking to recover the unpaid costs which it incurred in repairing the engine. Curtiss-Wright also filed a cross-claim against Rolls-Royce. The cross-claim alleged that any damages arising from an engine defect was Rolls-Royce's responsibility since Rolls-Royce manufactured the engine, and sought indemnity or contribution from Rolls-Royce in the event a judgment was entered against Curtiss-Wright.
 
 
 7
 In November of 1983, Hutchinson and Rolls-Royce entered into a settlement agreement pursuant to which Hutchinson agreed to release Rolls-Royce from the action and to indemnify Rolls-Royce against Curtiss-Wright's claims for indemnity or contribution. In return, Rolls-Royce agreed to pay Hutchinson $75,000. Upon learning of the settlement agreement, the trial court dismissed Rolls-Royce as a party to the action.
 
 
 8
 The case then proceeded to trial before the court. The trial court held that Curtiss-Wright was liable for breach of its express warranty based on the IGV and stator casing defects. The court also held that Curtiss-Wright was liable for misrepresentation based on Curtiss-Wright's representations that the power turbine was capable of operating for 100,000 hours when it knew that the stator casing would last only a fraction of that time. Finally, the court dismissed Curtiss-Wright's counterclaims.
 
 
 9
 The court awarded Hutchinson damages of $532,487. This figure (which was the same under either the breach of warranty[1] or the misrepresentation theory[2] ) represented a reimbursement of the $381,000 which Hutchinson had paid Curtiss-Wright to repair the engine, and a recovery of $149,000 to obtain and install a shrouded stator casing and $2,487 to ship the new stator casing from Curtiss-Wright's headquarters to Hutchinson.
 
 
 10
 The court also awarded Hutchinson prejudgment interest on the entire damage award from January 11, 1979 (the date the engine was damaged) to the date judgment was entered. The court further awarded Hutchinson its costs and disbursements, but denied Hutchinson's request for attorneys' fees.
 
 DISCUSSION
 1. Breach of Warranty
 
 11
 In finding Curtiss-Wright liable for breach of warranty, the trial court stated:
 
 
 12
 Curtiss-Wright's[3] only argument as to why it should not be held liable for breach of warranty is that Hutchinson failed to properly inspect the IGVs. It is clear that Hutchinson did have the opportunity to inspect the IGVs during the first 700 hours of operation. However, the Curtiss-Wright inspection requirements were an onerous burden for any purchaser and Curtiss-Wright failed to convince this court that proper inspection would have avoided the damage caused by IGV cracking. Curtiss-Wright's contention that failure to inspect should defeat the warranty must fail.
 
 
 13
 Hutchinson Utilities Commission v. Curtiss-Wright Corp., No. 3-80-83, slip op. at 17 (D.Minn. May 29, 1984) (footnote omitted).
 
 
 14
 On appeal, Curtiss-Wright continues to rely on its failure to inspect argument.[4] First, Curtiss-Wright asserts that Hutchinson is foreclosed from recovering under the express warranty because compliance with the IGV inspection requirements was a condition precedent to the existence of the express warranty. Second, Curtiss-Wright contends that Hutchinson cannot recover damages under the express warranty because Hutchinson failed to establish that a breach of the warranty, rather than its failure to inspect the IGVs, was the proximate cause of the engine damages.
 
 
 15
 a. Condition Precedent
 
 
 16
 In the contract of sale between Hutchinson and Curtiss-Wright, Hutchinson agreed that it would "[i]nsure full compliance with Curtiss-Wright's operating, and maintenance instructions." Curtiss-Wright's operating and maintenance manual required an inspection of each of the IGVs every 250 hours of engine use. At the time the January 11, 1979 engine damage occurred, the engine had been used over 700 hours, yet Hutchinson had not conducted an inspection of the IGVs. Curtiss-Wright argues that its IGV inspection requirement was a condition precedent to the existence of the warranty which was not satisfied by Hutchinson.
 
 
 17
 The only Minnesota case on point is Chatfield v. Sherwin-Williams Co., 266 N.W.2d 171 (Minn.1978). In Chatfield, a professional painter sued a paint manufacturer for breach of warranty in connection with the sale of red barn paint. The paint manufacturer argued that the painter was precluded from recovering for breach of warranty because the painter failed to follow its directions relating to the amount of linseed oil to put in the paint. The court dealt with this argument as follows:
 
 
 18
 Defendant also argues that, assuming the warranties involved here were breached, plaintiff is precluded from recovery of damages because he used the paint contrary to the directions and such "misuse" was beyond the scope of the warranties. Although defendant cites several cases in support of this claim--Chisholm v. J.R. Simplot Co., 94 Idaho 628, 495 P.2d 1113 (1972); Elanco Products Co. v. Akin-Tunnell, 516 S.W.2d 726 (Tex.Civ.App.1974); Iverson Paints, Inc. v. Wirth Corp., 94 Idaho 43, 480 P.2d 889 (1971); Brown v. General Motors Corp., 355 F.2d 814 (4th Cir.1966)--all are distinguishable from this case. In the Chisholm case, watering the fields within a specified time was essential to activate the weed killer which was alleged to have been defective, and the importance of following that direction should have been obvious to plaintiffs. In Iverson also, the directions for using the machine were very precise, and they were almost completely ignored--neither of which is the fact here. In the Elanco case the manufacturer had stressed the necessity of following directions and had disclaimed any affirmations made about the product unless the directions were followed. The court accordingly treated compliance with the directions as a condition precedent to the existence of the express warranty sued on. Here no comparable stress was laid on the importance of the directions, and they certainly were not specific and precise as to quantity. In Brown, plaintiff did not establish that there had been a breach of warranty, and that his use of a tractor by starting it when it was in gear was abnormal and unpredictable. Plaintiff used the paint here for its intended purpose.
 
 
 19
 We conclude that the trial court correctly instructed the jury that it could consider whether plaintiff complied with defendant's directions in determining whether he was negligent and whether his negligence was a cause of his consequential damages.
 
 
 20
 Id. at 176.
 
 
 21
 Here, the sales contract between Hutchinson and Curtiss-Wright did not provide that Hutchinson's compliance with the operating and maintenance manual was a condition precedent to the existence of the express warranty. Further, the trial court found that the IGV "inspection requirements were an onerous burden for any purchaser." Hutchinson Utilities Commission v. Curtiss-Wright Corp., supra, slip op. at 17. It may properly be assumed that the trial court meant that the periodic inspection requirement was unreasonable[5] because Curtiss-Wright demanded detailed inspections more frequently than was actually needed for proper maintenance. In addition, the court's finding supports a conclusion that it was not patently obvious to Hutchinson that periodic inspections of the IGVs every 250 hours of engine use were essential to the proper functioning of the GTGU. Finally, Hutchinson submitted evidence at trial indicating that Curtiss-Wright had not even mentioned the IGV inspection requirement when training Hutchinson employees in the operation and maintenance of the GTGU. Under these circumstances, we doubt that the Minnesota state courts would consider the IGV inspection requirement a condition precedent to the existence of Curtiss-Wright's warranty.
 
 
 22
 b. Proximate Cause
 
 
 23
 The trial court made the following finding on the proximate cause of the engine damage: "The IGVs in the Hutchinson GTGU suffered from a severe cracking problem. It was that cracking problem which led to the January 11, 1979 breakdown when a piece of an IGV broke off and was drawn into the engine causing secondary damage." Hutchinson Utilities Commission v. Curtiss-Wright Corp., supra, slip op. at 7. The district court specifically rejected Curtiss-Wright's argument that Hutchinson's failure to inspect the IGVs was the proximate cause of the engine damages, stating: "Curtiss-Wright failed to convince this court that proper inspection would have avoided the damage caused by IGV cracking." Id. at 17.
 
 
 24
 On appeal, Curtiss-Wright contends that the trial court improperly placed the burden of establishing the element of proximate cause on it rather than on Hutchinson, as indicated by the court's statement that "Curtiss-Wright failed to convince this court * * *." Id. (emphasis added). See Heil v. Standard Chemical Manufacturing Co., 223 N.W.2d 37, 41-42 (Minn.1974) (burden of establishing breach of warranty and proximate cause on plaintiff); Imdieke v. Blenda-Life, Inc., 363 N.W.2d 121, 124 (Minn.App.1985) (same). We do not read the phrase "Curtiss-Wright failed to convince this court" as allocating the burden of proof of proximate cause to Curtiss-Wright, especially in view of the appellate practice of interpreting trial court findings liberally so as to uphold the judgment. See Fossum v. Federal Land Bank, 764 F.2d 520, 522 (8th Cir.1985); Mackey v. Stanton, 586 F.2d 1126, 1130 (7th Cir.1978), cert. denied, 444 U.S. 882, 100 S.Ct. 172, 62 L.Ed.2d 112 (1979) ("When confronted with a court order subject to two possible interpretations, one in compliance with applicable * * * [law], the other in violation of * * * [the law], we must presume that the court intended its order to comply with the controlling law."). Instead, we interpret the disputed phrase as merely a statement rejecting an argument raised by Curtiss-Wright. Accordingly, we reject Curtiss-Wright's contention that the trial court improperly allocated the burden of establishing proximate cause.
 
 
 25
 There is no dispute over the fact that the burden of establishing error in regard to the trial court's proximate cause finding falls on Curtiss-Wright. See Sam Miller Bag Co. v. Burlington Northern, Inc., 641 F.2d 607, 608 (8th Cir.1981) (burden on complaining party). The trial court's proximate cause finding is a question of fact which cannot be disturbed unless it is clearly erroneous. Hysell v. Iowa Public Service Co., 534 F.2d 775, 781 (8th Cir.1976). See generally Anderson v. City of Bessemer City, --- U.S. ----, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985) (meaning of phrase "clearly erroneous" set forth). Curtiss-Wright has failed to meet its burden of establishing that the trial court's proximate cause finding was clearly erroneous. Since we have rejected each of the breach of warranty arguments which Curtiss-Wright has raised on appeal,[6] we affirm the trial court's finding that Curtiss-Wright is liable for breach of warranty.
 
 2. Misrepresentation
 
 26
 Curtiss-Wright argues that the trial court erred in finding that Hutchinson had established an actionable misrepresentation claim relating to the number of hours which the power turbine was capable of operating. "It is a uniform course of appellate review procedure to decline to review questions not necessary to a decision by an appellate court." Highland Supply Corp. v. Reynolds Metals Co., 327 F.2d 725, 729 (8th Cir.1964). Initially, it appears that this rule is applicable here. First, we have previously determined that Hutchinson has established an actionable breach of warranty claim. In view of the fact that the trial court found that the damages recoverable under the misrepresentation claim are the same as those recoverable under the breach of warranty claim,[7] it does not appear that Curtiss-Wright was adversely affected by the misrepresentation finding. We must address the trial court's misrepresentation finding, however, because Hutchinson's claim for a rescission remedy and for an award of attorneys' fees relies, in part, on proof of a misrepresentation. In addition, a finding on the misrepresentation claim may be necessary for the trial court's resolution of issues which may arise on remand.
 
 
 27
 In order to establish an actionable misrepresentation claim under Minnesota law, Hutchinson had to establish that Curtiss-Wright:
 
 
 28
 made a false representation of a past or existing material fact, susceptible of knowledge, knowing it to be false or without knowing whether it was true or false, with the intention of inducing the person to whom it was made to act in reliance upon it or under such circumstances that such person was justified in so acting and was thereby deceived or induced to so act to his damage.
 
 
 29
 Berryman v. Reigert, 286 Minn. 270, 175 N.W.2d 438, 442 (1970). Curtiss-Wright contends that the trial court erred in finding that Hutchinson had established an actionable misrepresentation claim because: 1) the representation regarding the operating capacity of the turbine was never made, 2) it was not false, and 3) Hutchinson did not justifiably rely on the representation. Curtiss-Wright's first two contentions are clearly meritless and do not warrant discussion.
 
 
 30
 Curtiss-Wright's lack of reliance argument is based on the fact that Hutchinson had hired an engineering company, Associated Consultants, Inc. (ACI), to help it evaluate generating units offered for sale by several companies, including Curtiss-Wright. ACI investigated both the cost and reliability of the available generating units. Curtiss-Wright contends that in investigating the reliability of its GTGU, it would be reasonable to assume that ACI made an independent inquiry into the operating capacity of the power turbine. This independent inquiry, Curtiss-Wright contends, precludes a finding of justifiable reliance on its representation.
 
 
 31
 The Minnesota Supreme Court has stated that: "If, before changing his position in reliance upon defendant's assertions as to its past experience in the territory, plaintiff had made independent inquiry as to the accuracy of the sales figures represented, reliance on the misrepresentation would not have been justified." Davis v. Re-Trac Manufacturing Co., 276 Minn. 116, 149 N.W.2d 37, 39 (1967) (citing Lack Industries, Inc. v. Ralston Purina Co., 327 F.2d 266 (8th Cir.1964) ). The court continued, however, stating: "But where, as here, a party to whom a representation has been made has not made an investigation adequate to disclose the falsity of the representation, the party whose misstatements have induced the act cannot escape liability by claiming that the other party ought not to have trusted him." Id. (emphasis added).
 
 
 32
 Here, the trial court recognized the likelihood that ACI investigated the operating capacity of Curtiss-Wright's GTGU, but the court found that ACI was justified in relying on Curtiss-Wright's representations because Curtiss-Wright was a newcomer to the power generating unit field and the defect in the stator casing was a particularly difficult problem to uncover. Since the trial court's finding of justifiable reliance is not clearly erroneous, we affirm the court's finding that Hutchinson established an actionable misrepresentation claim.
 
 3. Rescission Remedy
 
 33
 At trial, Hutchinson had sought either the statutory rescission remedy provided by MINN.STAT. Sec. 336.2-608, which is available to buyers who revoke their acceptance of defective goods, or the common law rescission remedy available in fraudulent misrepresentation actions. In regard to the statutory rescission remedy, the trial court found that Hutchinson had effectively revoked its acceptance of the GTGU on May 25, 1979, when it sent a letter to Curtiss-Wright which read, in pertinent part, as follows:
 
 
 34
 When the various problems that we have had with the Curtiss-Wright equipment are viewed in the context of your present attitude with respect to your refusal to honor your warranty as it relates to the gas generator, it is our opinion that there has been a total and complete failure of our contractual agreement which entitles Hutchinson Utilities to rescind that contract. We do not believe that we received from you a generating train which was capable of performing its intended function in accordance with the specifications upon which our contract was based. Furthermore, you have demonstrated an unwillingness to live up to the terms and conditions of the contract with respect to the service and warranty work. In view of these factors, we ask that you consider a return of all the Curtiss-Wright equipment which you sold to us under contract of December 11, 1975, and that you reimburse us the purchase price of the equipment plus interest to date.
 
 
 35
 There are obviously some misunderstandings existing between us. We are hopeful that they can be resolved in an amicable fashion but wish to inform you that we are prepared to resort to litigation if that becomes necessary. Before undertaking the expense and delay which could be involved in seeking a legal remedy we wish to invite you to discuss with us the alternative possibilities of rescission of our contract or repair of the damaged generator without requiring us to abandon all of our legal rights. We shall be pleased to meet with you at your convenience if you would like to explore this matter further. We await your prompt response and then act accordingly.
 
 
 36
 (emphasis added). See generally Durfee v. Rod Baxter Imports, Inc., 262 N.W.2d 349, 353 (Minn.1978) (requirements for an effective revocation of acceptance under MINN.STAT. Sec. 336.2-608). The court proceeded to find, however, that Hutchinson's conduct after this revocation was "inconsistent with the conduct of a buyer that no longer wants to abide by the terms of the contract," and that a "reacceptance" of the GTGU was effectuated. Hutchinson Utilities Commission v. Curtiss-Wright Corp., supra, slip op. at 14. This conduct consisted of Hutchinson's efforts to get the GTGU engine repaired and returned from Curtiss-Wright, Hutchinson's efforts to get the GTGU reinstalled at its plant, and Hutchinson's subsequent usage and maintenance of the GTGU. In regard to Hutchinson's post-revocation usage of the GTGU, the court stated:
 
 
 37
 The fact that Hutchinson did not actually run the unit on a daily basis is not determinative. From the very beginning, the GTGU purchased from Hutchinson was intended for use as a peak unit * * *. Moreover, the primary reason the GTGU was not used on a regular basis was because Hutchinson was in a position to purchase excess power from large utilities cheaper than it could produce the same power.
 
 
 38
 Id. at 16. Since Hutchinson had reaccepted the GTGU after the revocation, the court found that Hutchinson was not entitled to statutory rescission under the revocation of acceptance provisions of MINN.STAT. Sec. 336.2-608.
 
 
 39
 The trial court's finding that Hutchinson's post-revocation conduct amounted to a reacceptance of the GTGU was supported by substantial evidence and is not clearly erroneous. In particular, the court properly emphasized the fact that "at the time Hutchinson revoked acceptance, the gas engine was in New Jersey being repaired [yet] [f]or the next four months [after the revocation] Hutchinson, with the assistance of counsel, attempted to get the engine back to Hutchinson." Id. at 14 (emphasis added). A revoking buyer's primary goal is to get the defective goods out of its hands and to get the purchase price of the defective goods returned. Hutchinson's efforts to get the engine back from Curtiss-Wright is entirely inconsistent with this goal and Hutchinson has failed to show any reason for this conduct which is consistent with an attempt to carry out the prior revocation. Compare Jacobs v. Rosemont Dodge-Winnebago South, 310 N.W.2d 71, 76-77 (Minn.1981) (revoking buyers received a defective motor home back from the seller after the buyers had revoked acceptance, but only because seller did not want the motor home on its lot). See generally Johannsen v. Minnesota Valley Ford Tractor Co., 304 N.W.2d 654, 658 (Minn.1981) (en banc ) (factors to consider in determining whether post-revocation conduct amounts to a reacceptance). Since we agree with the trial court that Hutchinson reaccepted the GTGU, we affirm the trial court's finding that Hutchinson was not entitled to the statutory rescission remedy provided under MINN.STAT. Sec. 336.2-608.[8]
 
 
 40
 The trial court also properly rejected Huchinson's attempt to obtain a common law rescission remedy pursuant to its misrepresentation claim. Hutchinson had argued that rescission was available pursuant to MINN.STAT. Sec. 336.2-721, which provides:
 
 
 41
 Remedies for material misrepresentation or fraud include all remedies available under this article for nonfraudulent breach. Neither rescission or a claim for rescission of the contract for sale nor rejection or return of the goods shall bar or be deemed inconsistent with a claim for damages or other remedy.
 
 
 42
 The trial court acknowledged that "[s]ince the [Uniform Commercial Code] draftsmen mentioned rescission in Sec. 2-721 in connection with fraud there presumably is a remedy involving a buyer's return of goods and recovery of the purchase price, referred to as 'rescission', that exists independently of the UCC." Hutchinson Utilities Commission v. Curtiss-Wright Corp., supra, slip op. at 25. The court determined that the rescission remedy was not available in this case, however, reasoning as follows:
 
 
 43
 As noted above, in the discussion concerning revocation of acceptance, this court finds that following the revocation of acceptance, Hutchinson reaccepted the GTGU, thereby forming a new contract. Prior to the formation of the new contract--at the time Hutchinson reaccepted the GTGU--Hutchinson learned of the defect in the stator casing. Hutchinson cannot sustain a new cause of action for post May 25, 1979 misrepresentations because it could not have relied upon any representations Curtiss-Wright made concerning the stator casing. This does not defeat plaintiff's original claim for the misrepresentation made by Curtiss-Wright concerning the stator casing. Rather, it defeats the remedy of rescission.
 
 
 44
 Id. at 26 (emphasis in original).
 
 
 45
 Under Minnesota law it is established that "[a] buyer['s] * * * right to rescind a sale of goods upon grounds of fraud * * * may be lost where the buyer either affirms the transaction with knowledge of the fraud or * * * where the buyer fails to disaffirm the transaction within a reasonable time after discovery of the fraud, a result variously based upon principles of waiver, laches, or estoppel." Hemming v. Ald, Inc., 279 Minn. 38, 155 N.W.2d 384, 386 (1967). See also D. Dobbs, Remedies Sec. 9.4 at 620 (1973 ed.). Here, the trial court found that Hutchinson had learned of the stator casing defect prior to its reacceptance of the contract. In other words, Hutchinson affirmed the transaction with knowledge of the misrepresentation regarding the stator casing. Since the evidence fully supports this finding, we affirm the trial court's conclusion that Hutchinson was not entitled to a rescission remedy.
 
 4. Indemnity or Contribution
 
 46
 The type of settlement agreement entered into between Hutchinson and Rolls-Royce is commonly known as a "Pierringer release" due to the approval of its use in the seminal case of Pierringer v. Hoger, 21 Wis.2d 182, 124 N.W.2d 106 (1963).[9] The Minnesota Supreme Court has announced that
 
 
 47
 where the plaintiff has entered into a Pierringer-type release, settling his claims with some defendants and agreeing to pay any cross-claims of the nonsettling defendants, the settling defendants usually should be dismissed, but their negligence should nevertheless be submitted to the jury. If the release so provides, the indemnity cross-claims between all defendants should also be dismissed.
 
 
 48
 Frey v. Snelgrove, 269 N.W.2d 918, 922 (Minn.1978).
 
 
 49
 The trial court in the case at bar followed the Frey dictates to the extent that it dismissed all claims and cross-claims against Rolls-Royce. The court failed, however, to consider the possible responsibility which Rolls-Royce might have for the damages arising from the defective engine which it manufactured.
 
 
 50
 On appeal, Curtiss-Wright requests this court to remand this case to the trial court so that appropriate findings regarding Rolls-Royce's liability can be made. It argues that the Pierringer release of Rolls-Royce made Hutchinson liable for Curtiss-Wright's cross-claim against Rolls-Royce and that, accordingly, Hutchinson's damages must be reduced to the extent Rolls-Royce is found liable. See Lange v. Schweitzer, 295 N.W.2d 387, 390 (Minn.1980); Klimek v. State Farm Mutual Automobile Insurance Agency, 348 N.W.2d 103, 105 (Minn.App.1984).
 
 
 51
 Hutchinson, on the other hand, argues that Curtiss-Wright failed to raise this claim in a counterclaim after the cross-claim was dismissed and that Curtiss-Wright failed to introduce any evidence as to its theories of liability against Rolls-Royce. To this, Curtiss-Wright responds that its cross-claim against Rolls-Royce pled the theories of liability against Rolls-Royce upon which it relies, that it had argued the issue of Rolls-Royce's liability in pre- and post-trial briefs, and that any evidence which went to the engine defect supported its theories of liability against Rolls-Royce since Rolls-Royce manufactured the engine.
 
 
 52
 It is undeniable that, at trial, Curtiss-Wright raised the issue of Rolls-Royce's liability for the defective engine and sought to reduce any damages which might be awarded against it on this basis. The questions of whether Curtiss-Wright properly pled this issue and whether Curtiss-Wright submitted sufficient evidence to establish its claim should be answered by the trial court in the first instance. Because no findings were made on the matter, we remand so that the trial court may determine whether Curtiss-Wright is entitled to have the damage award reduced based on Rolls-Royce's liability for the defective engine.
 
 5. Prejudgment Interest
 
 53
 Under Minnesota law, "a plaintiff is entitled to prejudgment interest on a liquidated claim, or on an unliquidated claim if the claim is ascertainable by computation or reference to generally recognized standards such as market value, and if the claim does not depend on a contingency." Unique Systems, Inc. v. Zotos International, Inc., 622 F.2d 373, 379-80 (8th Cir.1980) (citations omitted). See also Gand v. Jay Brothers, Inc., 367 N.W.2d 645, 647 (Minn.App.1985). "The courts differentiate between liquidated and unliquidated damages because it is 'unreasonable to require defendant to compensate plaintiff * * * where defendant could not have readily determined the amount of damages himself * * * although in both cases plaintiff actually suffers loss of use of his money from the date of the wrongful act, for which loss he theoretically should be compensated.' " Layne-Minnesota p.r., Inc. v. Singer Co., 574 F.2d 429, 435 (8th Cir.1978) (quoting Potter v. Hartzell Propeller, Inc., 291 Minn. 513, 189 N.W.2d 499, 504 (1971) ).
 
 
 54
 In submitting its case to the trial court, Hutchinson suggested two different methods of computation. First, Hutchinson tendered a diminution in market value approach which would have resulted in a $2,094,059 recovery in addition to the $381,000 which it had paid to Curtiss-Wright on October 15, 1979. Second, Hutchinson sought a rescission remedy which would have resulted in a recovery of the $2.8 million purchase price, coupled with a return of the GTGU to Curtiss-Wright. The trial court rejected each of these methods of computation and instead granted a recovery of $532,487 based on the cost of repairing the GTGU to its warranted condition.
 
 
 55
 The existence of these numerous methods of computing damages which reach vastly different results parallels the facts in Alley Construction Co. v. State, 300 Minn. 346, 219 N.W.2d 922, 927 (1974), wherein the court reversed an award of prejudgment interest because "it would be unreasonable to hold that these unliquidated claims involved damages readily ascertainable by computation or reference to generally recognized standards." See also N-Ren Corp. v. American Home Assurance Co., 619 F.2d 784, 789 (8th Cir.1980) (four different damage figures submitted). The damage issue in this case was even further complicated by the possible necessity of determining which damages were attributable to Rolls-Royce. See Layne Minnesota p.r., Inc. v. Singer Co., supra, 574 F.2d at 435 (court denied prejudgment interest since the amount of damages attributable to the defendant was contingent on determining the amount attributable to other parties); Northern Petrochemical Co. v. Thorsen & Thorshov, Inc., 297 Minn. 118, 211 N.W.2d 159, 169 (1973). We find that the damages were not readily ascertainable before trial. Accordingly, we reverse the award of prejudgment interest.
 
 6. Attorneys Fees
 
 56
 Hutchinson argues that it was entitled to an award of attorneys' fees under MINN.STAT. Sec. 8.31, Subd. 3a, which provides:
 
 
 57
 In addition to the remedies otherwise provided by law, any person injured by a violation of any of the laws referred to in subd. 1 may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees and receive other equitable relief as determined by the court.
 
 
 58
 Subdivision 1 of MINN.STAT. Sec. 8.31 refers to the Minnesota Consumers Fraud Act, MINN.STAT. Secs. 325F.68-.70. Section 325F.69, subdivision 1 of that Act includes misrepresentation in the sale of merchandise in its list of unlawful practices. Hutchinson argues that the trial court should have granted its motion for an award of attorneys' fees pursuant to these statutes since it established a claim of misrepresentation in connection with the sale of the GTGU. See Cashman v. Allied Products Corp., 761 F.2d 1250, 1255 (8th Cir.1985) (misrepresentation, even without intent to deceive, is sufficient to support attorney fees award under the Minnesota statutory scheme in question).
 
 
 59
 Curtiss-Wright raises three arguments supporting the trial court's denial of attorneys' fees, but we deal only with Curtiss-Wright's assertion that the decision to award attorneys' fees under the Minnesota statute rests with the trial court and that the court did not abuse its discretion in denying an attorneys' fees award. Hutchinson responds that attorneys' fees awards are mandatory whenever the Minnesota statute's requirements are met because the discretionary language contained in the statute ("may" and "as determined by the court") does not refer to the award of attorneys' fees.
 
 
 60
 We are not convinced by Hutchinson's response. Under Minnesota law, "[t]he award of attorney fees rests almost entirely in the discretion of the court and will not be disturbed absent a clear abuse of discretion." Orman v. Orman, 364 N.W.2d 836, 838 (Minn.App.1985). See also Peterson v. City of Elk River, 312 N.W.2d 243, 246 (Minn.1981); Jacobs v. Farmland Mutual Insurance Co., 352 N.W.2d 803, 807 (Minn.App.1984), review granted, 360 N.W.2d 337 (1985). Absent statutory language contradicting this rule, we doubt that the Minnesota state courts would read a statute which merely authorizes attorneys' fees awards as making the awarding of attorneys' fees mandatory on the trial court. Accordingly, we find that the awarding of attorneys' fees under MINN.STAT. Sec. 8.31 is discretionary. We further find that the trial court did not abuse its discretion in this case. The court had awarded Hutchinson its costs and disbursements. A further award of attorneys' fees was authorized by statute, but not compelled by the facts in this case.
 
 
 61
 Finally, we note that Hutchinson has raised several additional charges of error which we find to be without merit.
 
 CONCLUSION
 
 62
 We reverse the trial court's award of prejudgment interest, remand for a determination of whether Curtiss-Wright is entitled to have the damage award reduced based on Rolls-Royce's liability, and affirm in all other respects.
 
 
 
 [1]
 The sales contract between Hutchinson and Curtiss-Wright contained a clause which provided that Curtiss-Wright's only obligation in the event of a breach of warranty was to repair or replace defective parts. The clause also disclaimed any liability for incidental or consequential damages
 The trial court found that this limited remedy failed of its essential purpose due to Curtiss-Wright's failure to adequately repair or replace the cracked stator casing. Accordingly, the court held that Hutchinson was entitled to all remedies available under the Uniform Commercial Code as adopted by Minnesota, including incidental and consequential damages. See MINN.STAT. Sec. 336.2-719(2); Soo Line Railroad Co. v. Fruehauf Corp., 547 F.2d 1365, 1373-74 (8th Cir.1977). This holding is not contested on appeal.
 
 
 [2]
 See infra at 10 n. 7
 
 
 [3]
 In its memorandum opinion, the trial court abbreviated the names of the parties as "CWC" (Curtiss-Wright) and "HUC" (Hutchinson). Throughout this opinion we have altered the quotes from the trial court's opinion to reflect the abbreviations which we use
 
 
 [4]
 In its brief, Curtiss-Wright also raises the argument that its warranty was not breached because the defect in the IGVs was a design defect rather than a defect of material or workmanship. Curtiss-Wright, however, fails to support this argument with anything other than conclusory language. Further, the trial court stated that "Curtiss-Wright's only argument as to why it should not be held liable for breach of warranty is that Hutchinson failed to properly inspect the IGVs." Hutchinson Utilities Commission v. Curtiss-Wright Corp., supra, slip op. at 17 (emphasis added). Curtiss-Wright fails to contend that it had presented the design defect argument to the trial court. Thus, "there is no need * * * to determine this issue [of whether the breach was a design defect] because it is our policy to refuse to consider a question that was never presented to, or passed upon by the trial court." Johnson v. Nordstrom-Larpenteur Agency, Inc., 623 F.2d 1279, 1281 (8th Cir.), cert. denied, 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980)
 
 
 [5]
 This case is distinguishable from Melcher v. Boesch Motor Co., 188 Neb. 522, 198 N.W.2d 57, 60-61 (1972), wherein the buyer of a car argued that a maintenance requirement was unreasonable and therefore unenforceable as a bar to his attempt to recover under the seller's express warranty. The court rejected the buyer's argument on the basis that the maintenance requirement was not unconscionable under Uniform Commercial Code Sec. 2-302
 It had been established in Melcher that compliance with the maintenance requirement was a condition precedent to the express warranty because the seller's warranty expressly stated that the buyer's performance of the maintenance requirements was a condition to the warranty. In the case at bar, the seller's warranty contained no such provision. Thus, the question to be determined in this case is whether compliance with the IGV inspection requirement was a condition precedent to the warranty, not whether the IGV inspection requirement is unconscionable.
 
 
 [6]
 In regards to the breach of warranty claim, the trial court noted: "Defendant did not raise, and this court declines to consider, whether the plaintiff's damages ought to be reduced because of their failure to inspect." Hutchinson Utilities Commission v. Curtiss-Wright Corp., supra, slip op. at 17 n. 8. Similarly, in Chatfield v. Sherwin-Williams Co., 266 N.W.2d 171, 176 (Minn.1978), the Minnesota Supreme Court refused to consider whether "a comparative-fault principle should be applied in breach-of-warranty actions" to reduce a plaintiff's damages, since the issue was not presented to the trial court. We also decline to reach the issue, as the issue was not presented at either the trial level or on appeal
 
 
 [7]
 The breach of warranty claim related to the cracking problems with the stator casing and the IGVs. On the misrepresentation claim, however, the trial court only found an actionable claim relating to the cracking problems with the stator casing. Thus, the misrepresentation claim does not include damages relating to the IGV failures, and hence, the damages recoverable under the misrepresentation claim may actually be less than the damages recoverable under the breach of warranty claim
 
 
 [8]
 Due to our conclusion that a reacceptance was effectuated, we need not determine whether the May 25, 1979 letter was sufficiently unequivocal to constitute an effective notice of revocation in the first place
 
 
 [9]
 The Minnesota Supreme Court has summarized the elements of a Pierringer release as follows:
 The basic elements of a Pierringer release are: (1) The release of the settling defendants from the action and the discharge of a part of the cause of action equal to that part attributable to the settling defendants' causal negligence; (2) the reservation of the remainder of plaintiff's causes of action against the nonsettling defendants; and (3) plaintiff's agreement to indemnify the settling defendants from any claims of contribution made by the nonsettling parties and to satisfy any judgment obtained from the nonsettling defendants to the extent the settling defendants have been released. See, Simonett, Release of Joint Tortfeasors: Use of the Pierringer Release in Minnesota, 3 Wm. Mitchell L.Rev. 1, 3, 8, notes 32 and 33 (1977).
 Frey v. Snelgrove, 269 N.W.2d 918, 920 n. 1 (Minn.1978). The indemnity clause in the release given by Hutchinson was atypical of the ordinary Pierringer release in that it covered cross-claims for indemnity as well as contribution. See id.